IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**TRUSTEES OF THE NORTHWESTERN OHIO PLUMBERS AND PIPEFITTERS PENSION PLAN, et al.,**

    Plaintiffs,

v.

**HELM & ASSOCIATES, et al.,**

    Defendants.

Case Number 3:10 CV 739

Magistrate Judge James R. Knepp II

MEMORANDUM OPINION AND ORDER

## Introduction

Before the Court are cross Motions for summary judgment. Also pending is Defendants' Motion to exclude the proffered testimony of Robert J. Lynn, Jr.

The District Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331. The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73.

Plaintiffs filed a Motion for Summary Judgment. (Doc. 57) to which Defendants filed an Opposition (Doc. 64). Plaintiffs then filed a Reply. (Doc. 68). Defendants filed a Motion for Partial Summary Judgment (Doc. 58) to which Plaintiffs filed an Opposition (Doc. 63). Defendants then filed a reply. (Doc. 67).  In addition, Defendants filed a Motion to Exclude Testimony. (Doc. 65). For the reasons given below, the Court grants in part and denies in part Defendants' Motion for Partial Summary Judgment, and denies Plaintiffs' Motion for Summary Judgment. The Court also grants Defendants' Motion to Exclude Testimony in part.

**Background**

Defendants Helm & Associates, Inc. (Helm) and Marine Building Group, Inc. (Marine) are Ohio corporations, incorporated in 1982 and 2001, respectively. (Doc. 56-4; 56-1, at 19). Helm is a full service mechanical contractor. (Doc. 56-2, at 8). The company began as a heating, air conditioning, and electrical contractor, but evolved over time to have a larger scope of business. (Doc. 56-2, at 7). During the time period relevant to this litigation, Helm undertook primarily new construction and reconstruction work, but also engaged in the service of existing systems. (Doc. 56-2, at 10). Marine, which was incorporated in 2001 but did not begin operations until 2007, was formed by the officers of Helm, namely John Schrein and Keith Helminski, to create a general contracting firm. (Doc. 56-2, at 6; 56-1, at 18). Whereas Helm performs its own work and subcontracts some work, Marine subcontracts all work. (Doc. 56-1, at 51; Doc. 56-2, 58-59).

Plaintiffs are trustees of various multi-employer fringe benefit plans for plumbers and pipefitters of northwestern Ohio. They allege that during the period of time from February 2, 2009 until July 31, 2010 (the audit period), Defendant Helm failed to make fringe benefit contributions required by the National Service and Maintenance Agreement (NSMA) to which Helm was signatory. They further allege that Defendant Marine is the alter ego of Helm, thereby binding Marine to any CBAs that Helm is bound to.

Helm became signatory to the NSMA on July 7, 2005. (Doc. 1-2). Article VII of the NSMA states that the agreement applies to all work performed "to keep existing mechanical, refrigeration and plumbing systems within occupied facilities operating in an efficient manner." (Doc. 1-1, at 7). Essentially, the agreement covers service work, not to be confused with construction work.

Helm became bound to the CBA between the Mechanical Contractors Association of

Northwestern Ohio, Inc. and the United Association, Local 50 Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada ("Local 50 Agreement"),[1] effective June 30, 2008. (Doc. 56-8, at 20). After a series of litigious disputes, Helm attempted to withdraw from the Local 50 Agreement, giving notice to the local union's business manager in February 2009. (Doc. 55-6). Despite this, Helm remained signatory to the NSMA with respect to service work. (Doc. 56-2, at 69).

The issue in this case is whether Defendants were obligated to pay contributions to Plaintiffs pursuant to either the NSMA or the Local 50 Agreement for various project work performed during the audit period. Plaintiffs assert a right to contributions totaling $403,808.50 and also seek attorney's fees. Defendants maintain they were not obligated to make such payments on account of Helm having withdrawn from the Local 50 Agreement. Defendants further argue that the contributions Plaintiffs seek are for work not covered under either the Local 50 Agreement or the NSMA.

## Defendants' Motion to Exclude Testimony

Defendants have filed an objection and Motion to exclude the proffered testimony of Robert J. Lynn, Jr. (Doc. 65). In the alternative, Defendants ask for leave to depose Lynn. The Court finds that several portions of Lynn's affidavit are inadmissible as lay witness opinion not based on personal knowledge. Because the Court will not consider the inadmissible parts of Lynn's deposition, the Court denies Defendants leave to depose Lynn.

The Federal Rules of Civil Procedure require affidavits or declarations used to support or oppose a motion for summary judgment to be "made on personal knowledge, set out facts that would

---

1. (Doc. 56-8, at 20).

be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. Civil R. 56(c)(4). An affidavit failing to meet these requirements is subject to a motion to strike and will not be considered in ruling upon a motion for summary judgment. *Yeazel v. Baxter Healthcare Corp.*, 2011 WL 711453, at *2 (N.D. Ohio). But courts should use a "scalpel, not a butcher knife" when doing this, and strike only the offending portions of an affidavit. *Id.* (quoting *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007).

Inferences, thoughts, and opinions of a witness are within the realm of personal knowledge so long as they are "premised on firsthand observations or personal experience and established by specific facts." *Id.* (citing *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1355 n.2 (6th Cir. 1996)). Still, to be admissible, a non-expert witness' testimony in the form of opinions or inferences must be limited to those which are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge". Fed. Evid. R. 701. Opinion testimony admitted under Rule 701 "requires a lay witness to have first-hand knowledge of the events he is testifying about so as to present only the most accurate information". *United States v. Hoffner*, 777 F.2d 1423, 1425 (10th Cir. 1985).

In support of their Motion for Summary Judgment, Plaintiffs offer an affidavit from Robert J. Lynn, Jr., the Market Recovery Specialist for the Local 50. (Doc. 63-1, at 1). Lynn's affidavit sheds no light on what his job entails, but rather merely states that he has personal knowledge regarding the matters within the affidavit. (Doc. 63-1, at 1). The bulk of Lynn's sworn statement involves him drawing legal conclusions from documents produced through discovery and reviewed by him. (Doc. 63-1, paragraph 5). His affidavit recites that he has familiarity with the work that

Helm "customarily bids on in the construction industry." (Doc. 63-1, paragraph 4). Lynn's testimony goes through a series of six specific projects that Helm worked on, drawing the conclusion for each one -- based on Lynn's knowledge of the construction industry and "other projects like" the ones examined -- that they fell within the scope of one of the relevant collective bargaining agreements.

As Defendants argue, Lynn's recitation of facts gleamed from discovery documents used to state bare legal conclusions is not based on personal knowledge. The majority of Lynn's testimony comprises his opinion that work done by Helm was covered under certain agreements. Since Lynn is not an expert witness, his opinions or inferences must be limited to those which are rationally based on his perception, pursuant to Rule 701(a). Instead, Lynn draws inferences and states opinions based on his review of documents long after the work described by said documents was performed. Lynn was not present at any of the job sites, nor does he apparently have personal knowledge of these projects stemming from any source other than the subpoenaed documents. A post hoc review of documents is not personal knowledge of the events described in the documents. Lynn's opinions that the work was covered under a specific CBA are therefore not rationally based on his perception. Lynn does not have first-hand knowledge as to whether the work fell within the scope of the various CBA's. Therefore, these portions of Lynn's affidavit must be disregarded when considering the pending Motions.

But Lynn's affidavit is not suspect in its entirety. Portions of Lynn's affidavit *are* based on personal knowledge and *do* set forth facts that are admissible as relevant evidence. For instance, the third sentence of paragraph 18 is explicitly based on Lynn's personal experience as a Market Recovery Specialist, because it reports facts he personally knows to have taken place (or not having taken place) during his tenure. (Doc. 63-1, at 5). Such portions of the Lynn affidavit ought not be

stricken and will not be ignored when considering the pending Motions.

Accordingly, the Court grants Defendants' Motion to exclude the proffered testimony of Robert J. Lynn, Jr. with respect to the portions of Lynn's affidavit that are impermissible lay opinions excluded under Rule 701(a), but denies Defendants' Motion with respect to the portions of Lynn's affidavit based on personal knowledge and setting forth facts admissible into evidence.

## Summary Judgment Standard of Review

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id.* When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## Analysis

<u>Alter Ego Status</u>

Plaintiffs argue that Marine is the alter ego of Helm and therefore liable as a matter of law to the same extent Helm is. (Doc. 57, at 15). Defendants contend that Marine is not Helm's alter ego, but even if it were, Marine could not be liable for Helm's unpaid contributions because it has never had any employees. (Doc. 58, at 15). As explained below, no reasonable fact finder could conclude that Marine is the alter ego of Helm. Therefore, Marine is entitled to judgment as a matter of law on the issue.

The alter ego of a signatory employer is bound to the same CBAs the employer is, so as to prevent employers from evading CBA obligations by merely changing or altering their corporate form. *Trs. of Detroit Carpenters Fringe Benefit Funds v. Indust. Contracting, LLC*, 581 F.3d 313, 317-318 (6th Cir. 2009). The controlling test for whether two companies are alter egos is whether they have "substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Id.* at 318. No individual factor is determinative; they must all be considered together. *Id.* The intent to evade the obligations of a CBA is a relevant factor to be considered, but finding such a motive is not a pre-requisite to imposing alter ego status. *Id.* at 319 (citing *N.L.R.B. v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 337 (6th Cir. 1990)).

John Schrein is the secretary of Helm and the president of Marine.[2] (Doc. 56-1, at 6). Schrein estimates that his time is divided equally between the two companies. (Doc. 56-1, at 7). Schrein is technically not compensated for his work as president of Marine. (Doc. 56-1, at 13). Keith Helminski is the president of Marine and the treasurer of Helm. (Doc. 56-2, at 5). Helminski is also technically not compensated for his work with Marine. (Doc. 56-1, at 30). In fact, Marine officially has no employees, and does not pay anyone for services other than subcontractors. (Doc. 56-1, at 31, 66; 56-2, at 18, 20). However, four employees of Helm have occasionally been loaned out to Marine for administrative work. This work is then part of the per-job mark-up when Helm bills Marine for a job. (Doc. 56-1, at 67, 69).

As the only officers of Marine, Schrein and Helminski are the only people with authority to sign checks through Marine's business account. (Doc. 56-1, at 36). Similarly, Schrein, Helminski,

---

2. Schrein is also the secretary of West River Group, the holding company that owns both Helm & Associates and Marine Building Group. (Doc. 56-1, at 11).

7

and Helminski's brother, Gerry, have signing authority for Helm's checking account. (Doc. 56-2, at 24). At Helm, hiring and firing power rests with Keith Helminski, Gerry Helminski, Paul Iwinski, and Michael Jones. (Doc. 56-2, at 25). Of these people, Keith Helminski is the officer with the most decision-making authority at Helm. For instance, he decides whether the company will subcontract out specific work or do it itself. (Doc. 56-2, at 59). The management of the two companies therefore has similarities, but is not substantially identical.

Marine was incorporated in Ohio on May 1, 2001. (Doc. 56-1, at 19). According to Schrein's testimony, the purpose of forming Marine was to "have a general contracting company." (Doc. 56-1, at 17). At the time, Helm was not a general contractor, but instead was only doing mechanical work. (Doc. 56-1, at 17-18). Marine began bidding on general contracting work in 2007, looking specifically for water treatment plant jobs. (Doc. 56-1, at 24). Since that time, the company has bid, and been awarded work, on various water treatment plant projects. (Doc. 56-1, at 30). In the meantime, Helm has evolved into a full service mechanical contractor, by no means limited to water treatment plant jobs. (Doc. 56-2, at 8). When putting together bids for Marine, Schrein uses Helm as a possible subcontractor for mechanical and HVAC work. (Doc. 56-1, at 32-33). On the basis of these facts, the business and purpose of the two companies are not substantially identical.

Marine has no construction equipment, but owns its own computers. (Doc. 56-1, at 39). But because Marine and Helm lease space in the same building, the two do share some office equipment. (Doc. 56-2, at 27). Also, Helm pays for the building's internet connection that Marine uses. (Doc. 56-2, at 27). Thus, the equipment of the two companies is not completely identical, but may be substantially identical.

In accordance with a non-collusion affidavit included in every bid, Marine and Helm never

bid on the same project. (Doc. 56-1, at 60). This means the two companies never have identical customers at the same time. Conversely, the companies do have identical ownership. That is, West River Group owns all of the shares issued by both Helm and Marine. (Doc. 56-1, at 20). The companies also appear to have similar supervision, both involving John Schrein and Keith Helminski, but Helm's supervision involves considerably more people, precluding it from being substantially identical to Marine's. (Doc. 56-2, at 25, 52).

When Marine submits bids, a "boilerplate list" of projects the firm has undertaken, called "works in progress" to show the contractor's experience, is attached to the bid. (Doc. 56-1, at 54). Even though this list is submitted by Marine, it contains projects done by Helm & Associates, not by Marine, since several of the projects listed pre-date Marine's existence. (Doc. 56-1, at 54-55). In other words, Marine submits bids listing as its own "works in progress" projects done by Helm. Schrein testified that this list "needed to be updated". (Doc. 56-1, at 54). Furthermore, Marine has submitted bids with statements saying they own all tools and equipment of the trade even though Marine itself does not own any construction equipment. (Doc. 56-1, at 56-57). On the same page, Marine indicated it employs a union qualified foreman and journeyman, though Schrein testified this referred to its subcontractors. (Doc. 56-1, at 57). Essentially, Marine has held itself out to customers as Helm. But despite Plaintiffs' estoppel arguments, this Court notes that such a holding out as the other company is not itself a factor to be expressly considered under the Sixth Circuit's alter ego precedent, though it may be relevant to show whether the two companies' operations are substantially identical.

Because Marine is exclusively a general contractor and Helm actually employs laborers to perform at least some of the work it contracts to do, the operations of the two companies are actually

9

remarkably different. In fact, because Marine subcontracts all work instead of using its own employees, it is not capable of operating as Helm's alter ego. The NSMA only creates obligations on employers for work the employer performs, as opposed to subcontracts. (Doc. 56-7, at 27) ("The Employer's obligations under this Agreement refers only to work that the Employer has contracted to perform."). Because Marine subcontracts all work, it cannot possibly be used to evade Helm's responsibilities under the NSMA. The purpose of finding alter ego status – to prevent employers from skirting CBA responsibilities through a change in corporate form[3] – cannot be achieved by finding Marine to be Helm's alter ego. *See Fullerton Transfer*, 910 F.2d at 337 (noting that the separation of two businesses where one had no employees that would have been covered under the other's CBA did not create a double-breasted situation). Marine is neither a successor corporation of Helm nor part of a double-breasted operation. It is not a "disguised continuance" of Helm or performing the same work as Helm while separated only in form. *See Id.* (quoting *Southport Petroleum Co. v. N.L.R.B.*, 315 U.S. 100, 106 (1942)).

Ultimately, the "determination of alter ego status is a question of fact." *N.L.R.B. v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986). Here, the undisputed facts show that Marine is engaged in such a different mode of work that it cannot be Helm's alter ego. Though the two companies have identical ownership and substantially identical equipment, no reasonable fact finder could determine that Marine's management, business, purpose, operation, customers, and supervision are substantially identical to Helm's. Therefore, Marine is entitled to judgment as a matter of law.

---

3. *N.L.R.B. v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986).

Double Paying

The Employment Retirement Income Security Act of 1974 (ERISA) codifies an employer's contractual obligation to pay contributions to multiemployer benefit plans:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. ERISA provides a civil cause of action to recover benefits due under an employee benefit plan. 29 U.S.C. § 1132(a)(1)(B). The statute also gives employee benefit plans the standing to sue as entities. 29 U.S.C. § 1132(d).

To recover unpaid contributions required by a CBA, the agreement must create an unambiguous obligation to pay the contributions. *Trs. of B.A.C. Local 32 Ins. Fund v. Ohio Ceiling and Partition Co., Inc.*, 48 Fed. Appx. 188, 194 (6th Cir. 2002) (*OCP I*). "Where the language of the CBA is clear, 'the actual intent or the understanding of the contracting parties is immaterial.'" *Trs. for Mich. B.A.C. Health Care Fund v. OCP Contractors, Inc.*, 136 F. App'x 849, 851 (6th Cir. 2005) (*OCP II*) (quoting *OCP I*, 48 F. App'x at 192). ERISA funds are accorded a special status that entitles them to enforce written agreements regardless of the defenses that might be available under the common law of contracts. *OCP I*, 48 F. App'x at 192.

Defendants argue that since they have already paid fringe benefit contributions to the funds of other unions for work during the audit period (Doc. 56-2, at 29), they should not be forced to "double pay" by also paying contributions to Plaintiffs. Defendants rely in part on *OCP I* for this proposition. In *OCP I*, the court reviewed a CBA and determined whether it required double payment of fringe benefit contributions in a situation involving unions from neighboring jurisdictions. *OCP I*, 48 F. App'x at 190. However, *OCP I* is distinguishable because the court found

11

the CBA ambiguous in its clause obligating the employer to pay fringe benefit contributions for work "within the area covered by an agreement". *Id.* at 195 ("We find that the first sentence of the BAC Traveling Contractor clause is susceptible to more than one interpretation."). The outcome of *OCP I* was based on the interpretation of a traveling contractors clause in the relevant CBA. In other words, the court was not stating that, as a matter of law, employers are never required to double pay benefits. Rather, the court held that a CBA may or may not obligate employers to double pay benefits in any given situation, but in that specific instance – because the CBA was ambiguous on the point – the employer was not required to double pay. "[T]he funds must show that the agreement created an unambiguous contractual obligation for the defendants to make contributions." *Id.* at 194 (citing *Trs. of the B.A.C., Local 5 New York Ret., Welfare Apprenticeship Training & Journeyman Upgrading & Labor-Mgmt. Coal. Funds v. Charles T. Driscoll Masonry Restoration Co., Inc.*, 165 F. Supp. 2d 502, 510 (S.D.N.Y. 2001)).

In fact, the court in *OCP I* was not seriously concerned with requiring double payment: "As we see it, it is not the possible double payment or the concern over a windfall that is the heart of the issue". *Id.* at 197. Consistent with the idea that an ERISA fund trustee has a status against contract defenses analogous to that of a holder in due course, "the mere fact that an award of benefits could cause an employer to 'pay double' would not be sufficient to relieve the employer of its contractual obligation to make contributions to the ERISA funds." *Id.* at 196-197. Therefore, the ultimate question here is whether any CBA the Defendants were signatory to unambiguously obligated them to make contributions to Plaintiffs, without regard to whether such contributions would amount to double payments.

In *OCP II*, the Sixth Circuit followed the same framework, looking to the language of the

CBA for an unambiguous obligation. *Trs. for Mich. B.A.C. Health Care Fund v. OCP Contractors, Inc.*, 136 F. App'x 849, 852 (6th Cir. 2005) (*OCP II*). The court noted that in situations involving a possibility of double payment for the same job, "the collecting trustee must show that the CBA created a contractual obligation for the employer to make contributions to both plans, even though only one union did the work." *Id.* at 851 (citing *OCP I*, 48 F. App'x 188, 198 (6th Cir. 2002)). That a CBA requires a double payment is not a valid reason to evade the responsibility, but for a CBA to require a double payment the language must be unambiguous on the point. Therefore, this Court must begin its analysis with the relevant language in the two CBAs at issue in this case.

This Court has already ruled that because Helm was signatory to the NSMA, Helm was required to make contributions for work covered by it even after withdrawing from the Local 50 Agreement:

> [T]he National Mechanical Service Contractors of America ('MSCA') agreement requires contributions and is not dependent upon a recognition of the Local 50 Agreement. Contrary to Helm's assertion, it would not be an unfair labor practice; it does not require bargaining; and the MSCA merely uses the Local 50 Agreement as a reference point to determine the appropriate contribution amount. In short, Helm was required to contribute even after Helm withdrew from Local 50. [Plaintiffs do] have audit and collection rights under the MSCA agreement.

(Doc. 27, at 3) (citations omitted).[4]

The language of the NSMA creates an obligation to make fringe benefit contributions "in accordance with the established local agreement covering service pursuant to paragraph 11 or per a Schedule 'A' for the jurisdictional area." (Doc. 1-1, at 10). Paragraph 11 of the NSMA defines the work covered by the agreement to include:

---

3. The Court is cognizant of the inconsistent nomenclature recurrent in this case. In the cited order granting partial summary judgment, the "MSCA" agreement is the "NSMA" referenced in this opinion.

13

> [T]he inspection, service, maintenance, start-up, testing, balancing, adjusting, repair, modification and replacement of mechanical, refrigeration or plumbing equipment including related piping connections and controls in addition to all other service, maintenance and operations work in order to meet customer obligations.

(Doc. 1-1, at 7).

Similarly, Schedule A of the Local 50 Agreement lists an extensive and detailed series of 51 types of work which are covered under the Local 50 Agreement. (Doc. 56-9, at 24). Of course, the Local 50 Agreement only requires contributions for such work when performed by an employee "covered by" the Agreement. The Local 50 Agreement defines "employee" as:

> [A] journeyman or apprentice plumber, steamfitter, pipefitter, pipefitter-welder; refrigeration or air conditioning worker; housing division plumber and mechanical equipment serviceman; employed by an Employer engaged in the work set forth in Schedule A.

(Doc. 56-8, at 23).

After analyzing similar language in *OCP II*, the Sixth Circuit concluded that no duty to double pay had been created. But the court's conclusion was based on two facts not necessarily present in this case: the work in question did not fall within the scope of work covered by the agreement, and the employees who performed the work did not meet the agreement's definition of "employees" because they were from a different profession. *OCP II*, 136 F. App'x at 852. The meaning of *OCP I* and *OCP II's* language about finding an unambiguous obligation to pay in situations involving possible double payment boils down to whether the work done falls within the scope of work covered by the CBA and whether the employees who did the work are within the CBA's definition of "employees". *See OCP I*, 48 F. App'x at 198. In both cases, the court analyzed these questions. Therefore, if covered work is performed by employees covered under a CBA – a situation not clearly present in either *OCP I* or *OCP II* – an unambiguous obligation could be found.

This Court is not in a position to make a determination similar to that in *OCP II* because there remains a factual dispute over whether the workers in this case were covered employees under the Local 50 Agreement. Defendants argue that because the workers were represented by other unions,[5] they could not be covered employees under an agreement requiring contributions to benefit plans for plumbers and pipefitters. But there is nothing in *OCP I* or *OCP II* that would prevent the finding of non-union employees (or members of other unions) as covered employees, if those employees meet the definition of "employee" under the relevant CBA. Here, the Local 50 Agreement defines "employee" in part by their occupation. (Doc. 56-8, at 23). Therefore, Plaintiffs must show either (1) that service work was performed within the scope of the NSMA as defined by Article VII thereof, or (2) the employees in dispute were journeyman or apprentice plumbers, steamfitters, pipefitters, pipefitter-welders, refrigeration or air conditioning workers, housing division plumbers, or mechanical equipment servicemen (*see* Doc. 56-8, at 23), and they engaged in work listed in Schedule A. In the absence of such a showing, there could be no unambiguous obligation under *OCP II*.

The information necessary to determine whether there was an unambiguous obligation to double pay is disputed and incomplete in the record. For instance, the revised audit lists some eighteen employees for whom Plaintiffs allege contributions are owed. (Doc. 57-3, at 2). Defendants deny in their answers to interrogatories that these individual employees performed work covered by the NSMA, arguing that most of them performed work under the local Laborers contract. (Doc. 56-10, at 16-21). However, when asked about one of the employees specifically, Helminski conceded

---

4. Fourteen employees for whom Plaintiffs seek contributions are members of the Laborers, IBEW, or UA unions. (Doc. 64, at 9).

15

that there may be overlay in the description of the work between the NSMA and the Laborers contract.[6] (Doc. 56-2, at 86-87). Whether work was actually performed in that overlay, and the amount of such work, are genuine issues of material fact to be resolved.

Burden Shifting

Plaintiffs urge this Court to follow *Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 695-696 (6th Cir. 1994), and find Defendants liable as a matter of law for their failure to pay contributions. In *Grimaldi*, the Sixth Circuit adopted the "sensible approach" taken by the Ninth and Eleventh Circuits with regard to burden shifting in ERISA collection actions. *Id.* at 695-696. Under this approach, "an employer is liable for contributions on all hours worked during a period in which it has been demonstrated that some covered work was performed" if, due to poor record keeping by the employer, it is impossible to determine with precision the amount due. *Id.* at 697. The policy behind this burden shifting seeks to prevent employers from benefitting from violating the record-keeping duty imposed by ERISA. *See* 29 U.S.C. § 1059. In *Grimaldi*, the court shifted the loss onto the employer for its failure to keep adequate records despite a stipulation between the parties that contributions need not be made for uncovered work. *Grimaldi*, 30 F.3d at 697. However, for the employer to be liable as a matter of law under this burden shifting framework, the funds seeking unpaid contributions must prove both that the employees performed some covered work and that the employer failed to keep adequate records. *Id.* at 696. *Grimaldi* inferred a failure to maintain adequate records from the fact that the employer provided no records at all with respect to 80% of the work performed under the CBA. *Id. See also Operating Eng'rs Pension Trusts v. B*

---

5. In fact, Helminski's opinion that no work under the NSMA was performed seems to be influenced by his view that the NSMA is not a binding CBA. (Doc. 56-2, at 70).

*& E Backhoe, Inc.*, 911 F.2d 1347, 1354 (9th Cir. 1990).

Thus, for Plaintiffs to shift the burden onto Defendants, they must first show that some covered work was performed during the audit period for which no contributions were made *and* that the Defendants failed to maintain adequate records. Plaintiffs have produced evidence showing that some covered work might have been performed during the audit period. Specifically, Plaintiffs have produced two daily reports -- time sheets that all Helm employees had to fill out on a daily basis -- showing covered work was performed. (Doc. 56-1, at 29). These daily reports are described in the deposition transcripts as generally giving accurate descriptions of the work actually performed.[7] (Doc. 56-1, at 29).

The first of the daily reports produced by Plaintiffs describes Gerry Helminski's work on February 24, 2009 as "Plumbing for sink. Install up to valve stops." (Doc. 57-4). The second describes work performed on March 23, 2009 as "measure counter, faucet . . . lay out and cut counter top, set sink, attach faucet & drain, cut lower boards to fit sink in." (Doc. 57-5). Under Articles XII and VII of the NSMA, which obligate signatory employers to pay contributions according to the local agreement for "the inspection, service, maintenance, start-up, testing, balancing, adjusting, repair, modification and replacement of mechanical, refrigeration or plumbing equipment", at least some of Helminski's work may fall within the scope of covered work. This is especially true for that which was self-described as "plumbing." Defendants dispute this, though, by arguing that any sort of plumbing work was construction, not service, and therefore not covered by the NSMA. (Doc. 56-2, at 76). The record is incomplete on the issue. Thus, a dispute of fact

---

6. According to Schrein's deposition, Helm never challenges employees on the scope of work they identify in the daily reports as having done. (Doc. 56-1, at 29). Helminski questions their accuracy but only with respect to whether they are complete. (Doc 56-2, at 30).

17

persists.

Defendants point the Court toward *Interior Sys. Local No. 1045 of Mich. Regional Council of Carpenters v. Teronisha, Inc.*, 2001 WL 12118776 (E.D. Mich.). Upon comparison, though, *Teronisha* works against Defendants by further clarifying the applicability of the *Grimaldi* burden shifting to the case at hand. The court in *Teronisha* denied summary judgment by distinguishing *Grimaldi* on the grounds that it applies only to situations where the total number of hours the employees worked had already been established. *Id.* at 3. In *Teronisha*, a genuine issue of material fact remained because the defendant disputed the accuracy of the audit, arguing that the auditor had used improper sources (the wrong tax forms) to derive their figures. *Id.* at 2. This case is more like *Grimaldi*, though, in that the total number of hours worked by the employees is not disputed. What is primarily disputed here is the number of <u>covered</u> hours worked, just as in *Grimaldi*. *See Grimaldi*, 30 F.3d at 696. However, the record also reflects a dispute over the accuracy of the audit. (Doc. 56-2, at 76).

Defendants argue the auditor made incorrect assumptions and used incorrect formulas. In his deposition, Helminski staunchly refuted the accuracy of the audit based on the documents Helm had provided the agency conducting it. (Doc. 56-2, at 76). Nevertheless, the auditor testified in her affidavit that Defendants, despite her request, did not provide her with an occupation list detailing the type of work performed by each employee. (Doc. 57-1, paragraphs 4-5). Such an occupation list might have prevented disputes about the number of hours that were covered work by informing the auditor which employees were not involved in plumbing and pipefitting occupations. In fact, because a worker's occupation determines whether they are a "covered employee" under the Local

50 Agreement's definitions,[8] this information appears indispensable. If Defendants lack this information because of a failure to keep records as required by ERISA,[9] Defendants might be unable to meet their burden under *Grimaldi* of showing with precision the number of covered and uncovered hours worked. The result, assuming Plaintiffs show at least some covered work, would be liability for contributions for all worked hours, covered or not, during the audit period. "[A]n employer cannot escape liability for his failure to pay his employees the wages and benefits due to them under the law by hiding behind his failure to keep records as statutorily required." *Id.* at 697 (quoting *Brick Masons Pension Trust v. Indust. Fence and Supply*, 839 F.2d 1333, 1338 (9th Cir. 1988). Still, by disputing the accuracy of the audit, Defendants have nonetheless raised another material issue of fact for trial.

**Conclusion**

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is granted in part and denied in part. Plaintiffs' Motion for Summary Judgment is denied. Defendants' Motion to exclude testimony is granted in part.

IT IS SO ORDERED.

s/James R. Knepp II
United States Magistrate Judge

7. See the definition of "employee" recited above. (Doc. 56-8, at 23).

8. 29 U.S.C. § 1059.